SuMORRISON TENENBAUM PLLC
*Counsel to the Debtors*
87 Walker Street, Second Floor
New York, New York 10013
Phone: 212-620-0938
Lawrence F. Morrison, Esq.


UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

Case No. 20-42673 (AST)

In re:                                                      Chapter 11

FEATHERSTONE DISTRIBUTION, LLC                (Under Subchapter V)

Jointly Administered


--------------------------------------------------------------------------X


## DEBTORS' PLAN UNDER SUBCHAPTER V OF CHAPTER 11


Featherstone Distribution, LLC ("Featherstone") and Hunts Point Enterprises, LLC ("Hunts Point"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above captioned chapter 11 case (the "Case"), by their counsel, Morrison Tenenbaum, PLLC, hereby propose the following plan of reorganization (the "Plan") under § 1189, §1190 and § 1191 of Title 11 of the United States Code (the "Bankruptcy Code"). As required under the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority of payments as provided under the Bankruptcy Code. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive under the Plan.


ALL CREDITORS SHOULD REFER TO ARTICLES VII THROUGH VIII OF THIS PLAN FOR INFORMATION REGARDING THE PRECISE TREATMENT OF THEIR CLAIMS. YOUR RIGHTS MAY BE AFFECTED. YOU SHOULD READ THESE PAPERS CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY, IF YOU HAVE ONE. (IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.) THIS PLAN IS A PROPOSAL BY THE DEBTOR AND SUBJECT TO COURT APPROVAL AFTER OPPORTUNITY FOR OBJECTIONS AND A HEARING. YOU ALSO HAVE THE RIGHT TO FILE AN OBJECTION TO CONFIRMATION OF THE PLAN. YOU WILL BE PROVIDED AN ORDER FROM THE BANKRUPTCY COURT SETTING FORTH

## ARTICLE I
## BACKGROUND, HISTORY AND FINANCIAL INFORMATION

### A. Nature and History of the Debtors' Commercial and Business Activities[1]

Debtors are Delaware limited liability companies with their corporate offices at 359 Van Brunt St, Brooklyn, NY 11231, Brooklyn, NY. Mark Rimer ("Mr. Rimer") is the sole beneficial owner of the Debtors and directs their operations and finances.

### Featherstone Distribution, LLC

Debtor Featherstone Distribution, LLC is a distributor of bakery goods in New York City and throughout the tri-state area. Before the onset of COVID-19, Debtor distributed baked goods from more than 20 bakeries and supplied on average more than 500 food service customers daily. The Debtor has two lines of business: (i) purchasing fresh, artisanal bakery products from bakeries in the area and selling these products on to hotels, restaurants, grocery stores and other food service businesses through its fleet of approximately 30 vehicles, and (ii) providing delivery services to local bakeries for a fee. Featherstone also works with customers to develop custom programs (such as pastry and sandwich programs) to suit their business requirements (collectively, the "Featherstone Business"). Debtor Featherstone Distribution, LLC is a wholly owned subsidiary of Debtor Hunts Point Enterprises, LLC.

The Featherstone Business was purchased by the Featherstone Debtor on or around July 10, 2019, pursuant to an asset purchase agreement between Featherstone Distribution, LLC as purchaser and Mr. Joel Schonfeld ("Schonfeld") and nonparties Featherstone Foods, Inc. and

---

[1] For purposes of this Plan, the term "Debtor" or "Debtors" shall refer collectively to Hunts Point Enterprises, LLC as parent of Featherstone Distribution, LLC its wholly owned subsidiary. The Chapter 11 cases of the Debtors are being jointly administered under Bankruptcy Case No. 20-42673 (AST).

Sesame Distribution Inc. as sellers (the "Asset Purchase Agreement"). Under the Asset Purchase Agreement Featherstone acquired all of the assets, including all of the goodwill, of Schonfeld's wholesale bakery distribution business (the "Transaction"). The Transaction closed on or around November 30, 2019, at which time Mr. Rimer took possession of the Featherstone Business. Featherstone is a wholly owned subsidiary of Hunts Point Enterprises, LLC, which is owned beneficially by Rimer.

**Hunts Point Enterprises, LLC**

In addition to holding all of the equity of the Featherstone Debtor, Hunts Point also owns all of the membership interest of non-party Freshly Baked Holdings LLC ("Freshly Baked"), a bakery which it acquired on or around December 1, 2019. The Freshly Baked subsidiary is operating at a loss in the current environment. The business has no long-term contracts other than its agreement with the Featherstone Debtor for distribution of baked goods and its lease for the premises located at 359 Van Brunt St, Brooklyn, NY 11231, Brooklyn, NY. During the COVID-19 pandemic, Hunts Point began selling baked goods provided by Freshly Baked directly to the public through its online platform, breadbasket.nyc.

Debtor is the co-borrower along with the Featherstone Debtor of the secured credit facility provided by Internex Capital Funding, LLC, 205 E 42nd Street, 20th Floor New York, NY 10017 (the "DIP Lender"). The facility provided by DIP Lender is an asset backed loan. The amount of capital available under the facility is based on Featherstone's eligible accounts receivable. The facility is used to provide funding for the operation of the Featherstone Debtor, which the Hunts Point Debtor owns and manages.

**B. Events leading to the Debtor's filing of the Chapter 11 Bankruptcy Case**

<u>**The COVID-19 Pandemic**</u>

In late February of 2020, the COVID-19 virus began spreading across the United States creating an unprecedented public health crisis. New York City became an early epicenter of the outbreak. In response to the crisis, Governor Andrew Cuomo issued an executive order mandating that grocery stores, hotels, restaurants, bars and other retail businesses must either close completely or severely curtail operations.[2] These and other actions by government authorities to protect public health have had the unintended consequence of decimating the hospitality industry in New York City, which has had a deleterious effect on the business of both Debtors.

Featherstone's sales have declined precipitously in the wake of government restrictions and changing consumer habits. The few food businesses which remained operational in the second calendar quarter of 2020 dramatically reduced their ordering due to severely decreased customer demand. The majority stopped placing orders altogether and stopped making payments to Featherstone on outstanding invoices. The Debtors likewise stopped making payments temporarily on pre-pandemic amounts due to its vendors and suppliers.

Debtors have struggled to adapt its business to a continuously changing paradigm. For example, restaurant sales began to increase in the summer months following the lifting of restrictions on outdoor dining; but sales contracted again in September as businesses either

---

[2] On March 7, 2020, Governor Andrew Cuomo issued Executive Order No. 202 Declaring a Disaster Emergency in the State of New York, which was followed by Executive Order No. 202.3 declaring that "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption. Executive Order [Cuomo] (9 NYCRR 8.202.3)

closed their doors after burning through federal stimulus funding or reduced ordering due to declining demand. Food service customers, including restaurants, previously accounted for more than 50% of Featherstone's sales; that number is now closer to 25%. In contrast, the grocery industry has thrived during the economic downturn caused by COVID-19. Featherstone has increased its sales through grocery channels, but that shift has come at the expense of significantly compressed margins.[3]

## Ongoing Disputes with Joel Schonfeld

While the pandemic was upending the hospitality industry in New York City, Debtor was also struggling to integrate Schonfeld into the newly acquired business. Schonfeld openly complained of Mr. Rimer's operation of the business and the new management team Mr. Rimer put in place. Schonfeld's conduct towards some of those senior executives, and some rank and file staff, devolved into a pattern of harassment which led to the resignation of one senior executive, and others threatening to resign if Schonfeld was not reigned in. Mr. Rimer concluded that without significant intervention, Schonfeld would not be able to conform with modern workplace practices, and, left unchecked, his actions would expose the company (and Mr. Rimer personally) to legal action.

To compound matters, Featherstone had made several financial arrangements for Schonfeld in the first quarter of 2020 to ease his transition from owner to employee. By way of example, Mr. Rimer authorized monthly advances to Schonfeld against future consulting fees, which were payable quarterly. However, as the economic freeze brought about by the COVID-19 outbreak forced the company to furlough and/or layoff dozens of employees, Mr. Rimer could no

---

[3] Restaurant sales generate approximately 50% higher margins than sales to grocery.

longer authorize these accommodations. Schonfeld reacted aggressively, retaining legal counsel and threatening to sue Featherstone for alleged breaches of his consulting agreement.

Schonfeld's unapologetic conduct with respect to Featherstone employees and his unrelenting demands during what was proving to be an existential crisis for the business left Mr. Rimer with few options. In April of 2020 Mr. Rimer made the difficult decision to terminate the Schonfeld consulting agreement for cause. Schonfeld reacted by commencing a lawsuit against the Featherstone Debtor and Mr. Rimer individually.

The Debtor's immediate need for relief in this Court stemmed from **(a)** amounts payable to suppliers, primarily the independent bakeries which Debtors rely on to supply their customers, **(b)** rebates due to customers of the Featherstone Debtor; **(c)** unspecified damages claimed owed to Mr. Schonfeld arising from the alleged unlawful termination of his consulting agreement with Featherstone; **(d)** the unperfected, disputed security interest in the assets of Hunts Point; **(e)** Debtor's dispute with Mr. Schonfeld with respect to the calculation of contingent payments under the Asset Purchase Agreement, and **(f)** Debtor's inability to address other past due debts. Debtor filed these Chapter 11 cases to be able to continue operating in the face of lawsuits and mounting liabilities, and to thereby maximize value for the benefit of all stakeholders.

Debtors have continued to work with many of its unsecured creditors throughout these bankruptcy proceedings to ensure the continuation of the Featherstone Business post confirmation. Through these efforts and a calculated reorientation of its sales efforts toward grocery and direct-to-consumer channels, the Featherstone Business is showing signs of recovery even in the face of continuing restrictions on large gatherings, limitations on the operation of restaurants in New York City, and the persistent closure of hundreds of hotels and catering halls across the City. Where Featherstone lost money in the second quarter of calendar year 2020, the

company stemmed its losses in the third quarter. Featherstone will either break even in the fourth quarter of 2020 or end the year with a slight loss. Subject to restructuring Featherstone's debts, Debtors expect a return to profitability in 2021 as the hospitality industry begins its return to normal.[4]

Negotiations remain ongoing with Mr. Schonfeld for potential return to Featherstone, subject to a number of conditions as well as resolution of the disputes relating to his still unpaid working capital adjustment totaling between $150,00 and $218,000, future consulting fees and contingent payments under the Asset Purchase Agreement. As of this date, the parties have not been able to reach an agreement, and thus the Schonfeld Litigation (as described below) has not been resolved.

### C. Pending Litigation

1. <u>The Schonfeld Litigation</u>. Mr. Schonfeld, and entities under his direction and control, commenced an action against Debtor Featherstone Distribution, LLC in a matter originally brought in New York State Court, County of New York (Index No. 65289/2020) on or around June 24, 2020 alleging, inter alia, breach of the asset purchase agreement and the consulting agreement. That matter has been removed to this Court (the "Schonfeld Litigation"), under Case Number 1:20-CV-05763.

The Schonfeld Litigation alleges, *inter alia*, that the Featherstone Debtor breached its consulting agreement with Schonfeld. Schonfeld argues in his complaint that Debtor did not have cause to terminate the Consulting Agreement. Debtor believes that the termination was proper

---

[4] Featherstone received a loan in the amount of $1,025,830 through the Paycheck Protection Program provision of the CARES Act (the "PPP Loan"). Under the CARES Act, Featherstone was authorized to use the proceeds of the loan to cover the cost of payroll, rent and other essential functions. It is anticipated that the PPP loan will be forgiven in its entirety; thus while the loan value remains on the books, the calculations set forth in this Plan do not include repayment of the PPP Loan.

and for cause due to Schonfeld's hostile treatment of Debtor's employees, including without limitation his repeated use of a racial epithet in reference to an Asian American employee of Debtor, and his refusal to participate in diversity and inclusion training. The Schonfeld Litigation also alleges breach of the Asset Purchase Agreement, which Debtor disputes. In addition to monetary damages, Schonfeld demands declaratory judgement to lift the restrictions contained in the Asset Purchase Agreement and the Consulting Agreement which prevent him from soliciting Debtor's customers and vendors, and otherwise competing against Debtor in the geographic area that is within 150-mile radius of New York City (the "Restrictive Covenants"). Debtor in turn argues that under New York law it is well established that a seller of good in an ongoing business has an implied duty to refrain from soliciting former customers. Further, Debtor contends that Schonfeld has already received approximately $1,000,000 in consideration from the sale of his business (90% of which is attributed to the sale of good will) and should not be permitted to breach restrictive covenants to the detriment of the business and its creditors.

These matters are currently before the Bankruptcy Court pursuant to an Order to Show Cause brought by the Featherstone Debtor to enjoin Mr. Schonfeld from soliciting Featherstone customers and competing with the Featherstone Business in contravention of the Restrictive Covenants.[5]

2.  The Zigler Litigation.  Mr. Rimer and Mr. Schonfeld are joint defendants in the matter of David Zigler v. Featherstone Foods, Inc., Caraway Realty, LLC, Sesame Distribution, Inc., Joel Schonfeld, Kuzari Group, LP and Mr. Rimer (Case No.: 20-cv-02462),

---

[5] The Featherstone Debtor alleges that Mr. Schonfeld has already breached the Restrictive Covenants by attempting to resell his customer list to a competing business, diverting customer accounts to a buying group, and manipulating customers of Debtor to try and leverage a favorable settlement. Debtor sought and obtained a temporary restraining order to prevent further harm to Debtor's business from Schonfeld's breach of the Restrictive Covenants.

filed in the Southern District of New York on March 20, 2020 (the "Zigler Action"). The plaintiff in that action, Mr. David Zigler, is a former employee of Joel Schonfeld who voluntarily terminated his employment prior to the closing of the Transaction. Mr. Zigler alleges that Mr. Schonfeld breached his agreement to offer Mr. Zigler a right of first refusal to purchase the Featherstone Business. Neither Debtor is named in Zigler Action, however, as the causes of action arise from the Transaction, we expect that the Featherstone Debtor will ultimately become a party.

3. <u>NLRB Matter</u>. The National Labor Relations Board, on information and belief, is seeking to enforce a judgement against Debtor in the matter of RM Bakery, LLC, D/B/A Leaven & Co., a Wholly-Owned Subsidiary of BKD Group, LLC Case No. 19-3716 (2d. Cir.); NLRB Case No. 02-CA-235116 (the "NLRB Action"). While the NLRB has not initiated a formal action against Debtor in the NLRB Action, it has issued subpoena's for turnover of documents and the production of employee witnesses.[6] Debtor in this matter is not affiliated with RM Bakery, LLC under the Bankruptcy Code.[7]

## ARTICLE II
## DEFINITIONS

As used in this Plan, capitalized terms have the meanings set forth below.

**A.** "**Administrative Expenses**" shall mean a cost/expense of administration of a Chapter 11 cases, including any actual or necessary expenses of preserving the Estate or any actual or necessary expenses of operating the Debtor's business from and after the Petition Date to and including the Confirmation Date and all costs of administration allowed by the Court in

---

[6] Debtor has not been formally named as a party in the NLRB Action.
[7] 11 U.S. Code § 101(2)(A) ("The term "affiliate" means.... [an] entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor....")

accordance with the Code.

**B.** "**Allowed Claim**" shall mean proof of which is filed within the time fixed by Bankruptcy Rules or by the Court or, if the claim arose from the rejection of an executory contract or unexpired lease, within such other time as may be fixed by the Court or; as to which no objection to the allowance thereof has been filed within the applicable time fixed by the Court, or as to which such objection has been determined by Order of the Court, which has become final and non-appealable and as to which no appeal is pending.

**C.** "**Confirmation**" or "**Effective Date of Confirmation**" shall mean that date on which the Order confirming the Plan becomes final.

**D.** "**Debtors**" shall mean Featherstone Distribution LLC and Hunts Point Enterprises, LLC.

**E.** "**DIP Claim**" means the superpriority administrative expense claim of Internex Capital Funding, LLC against either of the Debtors arising under the DIP facility pursuant to the interim and final orders entered by the Bankruptcy Court including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

**F.** "**Disposable Income**" includes income that is received by the Debtors from their business operations that is not reasonably necessary to be expended for the payment of it expenditures necessary for the continuation, preservation or operation of Debtors' business.

**G.** "**Impaired Creditor**" shall refer to the Bankruptcy Code definition of an impaired claim or interest. This is paraphrased as meaning that the Plan provides for the claim holder(s) or amount or method of repayment being altered from the original note or instrument entered into with the Debtor. The Bankruptcy Code requires that a Plan designate impairment or non-impairment in specified treatment of claims.

**H.** "**Plan**" shall mean the Plan of Reorganization of Debtors.

**I.** "**Secured Creditors**" shall mean all holders of secured claims who hold a lien, security interest or other encumbrance which has been properly perfected as required by law with respect to the property of the Debtor or any other property, provided by guarantors or co-signers to the extent that liquidation of secured collateral would satisfy the secured portion of the claim; for purposes of this Plan, Secured Creditor shall include Internex Capital Funding, LLC, and any amounts received pursuant to the CARES Act Paycheck Protection Program which is not subject to forgiveness.

**J.** "**Secured Claim**" shall mean an allowed claim of a creditor secured by a lien on properties in which the Estate has an interest or that is subject to set-off under § 553 of the Bankruptcy Code to the extent of the value "determined in accordance with §506(a) of the Code" if such creditor's interest in the estate's interest in such property or the extent of the amount subject to set-off.

**K.** "**Unsecured Creditors**" and "**Unsecured Claims**" shall mean all creditors of the Debtor who hold claims for unsecured debts, liabilities, demands or other claims of any character whatsoever, including secured creditors to the extent that liquidation of secured collateral would not satisfy their claims.

**ARTICLE III**
**DEBTORS' COMPLIANCE WITH THE CODE**

Debtors have filed this Plan in good faith. Through Mr. Rimer, Debtors represent that the information contained herein is true and correct to the best of their knowledge and understanding. Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code. The Debtors do not believe that Subsections (a)(6), (a)(13), (a)(14) and (a)(15)

of Section 1129 of the Code are applicable to the Debtors or this Plan. Debtors affirmatively assert that the Plan complies with the applicable provisions of Section 1129(a)(1) of the Bankruptcy Code and has been proposed in good faith and not by any means forbidden by law in contravention of Section 1129(a)(3) of the Bankruptcy Code. Further, Debtors affirmatively assert that they have complied with the applicable provisions of Section 1129(a)(2) of the Bankruptcy Code. Debtors affirmatively assert that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors in violation of Section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE IV
## SOURCE AND MANNER OF PLAN PAYMENTS

The successful consummation of the Plan will be subject to the continuation of business operations of Debtors and minimization of business expenses. Were the Debtors to cease operation, there would not be any future revenue in a Chapter 7 liquidation case. As a consequence, the debtors' best mechanism for the payment of their debts is their future operation, and the Plan provides more in distribution than the funds that would be available from the liquidation of Debtors' assets for the payment of pre-petition unsecured claims.

Under the proposed Plan, Debtors will pay the unsecured creditors a dividend equal to the Disposable Income Debtors project to earn over thirty six (36) months following the Effective Date of Confirmation (subject to priority payments as more fully described herein) in full satisfaction of the Allowed Unsecured Claims.

Debtors shall continue to be beneficially owned and operated by Mr. Rimer, and Debtors shall remain in possession of their respective assets. Mr. Rimer, shall perform all functions necessary to consummate the Plan, including the operation of Debtor's business activities, post-

confirmation. The Featherstone Debtor shall act as the disbursing agent for making all distributions required under the Plan. The Debtor's Director of Operations, Eli Richman, will be the party on behalf of the Debtors to perform disbursing agent tasks. The dispersing agent shall serve without bond and shall not be compensated for distribution services rendered and expenses incurred pursuant to the Plan. Except as otherwise provided in this Plan, Debtors shall pay the Subchapter V Trustee (the "Trustee") his fees for overseeing Debtor's activities under this Plan.

**ARTICLE V**
**PLAN TERM**

The term of this Plan begins on the date of Confirmation of this Plan and ends on the thirty sixth (36th) month following that date.

**ARTICLE VI**
**GENERAL DISTRIBUTIONS UNDER PLAN**

Debtors represents that the value of the property to be distributed under the Plan during the Term is not less than the Debtor' s projected Disposable Income for a 36-month period, subject to full payment of secured, administrative, and priority claims in accordance with the Bankruptcy Code. Under the Plan, general unsecured creditors will receive $626,130 (the "Projected Disposable Income Amount") to be paid monthly out of Debtor's available Disposable Income commencing the first full month following the three month anniversary of the Effective Date of Confirmation, which amount will be shared on a pro rata basis among them.

**ARTICLE VII**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

Debtors have classified all claims and interests in accordance with §§ 1122, 1123, and 1190 of the Bankruptcy Code. Appendix A contains the Debtors' Schedules listing the

proposed classifications of each, and whether each of the claims is disputed. The classification of claims and proposed treatment within each class is as follows:

**A.** **Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees**

1. <u>Unclassified claims</u>. Under § 1123(a)(1), administrative expense claims, priority tax claims, and statutory fees are not in classes.

<u>Administrative expense claims</u>. Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

| Name and type of Administrative creditor | Estimated Amount of Claim | Treatment |
|---|---|---|
| Morrison Tenenbaum PLLC, counsel to the Debtors | $100,000.00 | Paid $25,000 upon Effective Date of Confirmation with the remainder payable over the duration of the Plan. |
| Yann Geron, Subchapter V Trustee | $[15,000.00] | Paid in full on the effective date. |
| B. Riley Advisory Services (Formerly Known as GlassRatner) | $ 29,609.00 | Paid in full on the effective date. |

All final requests for payment of professional fee claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid up to the full allowed amount in cash by Debtors.

2. <u>Priority tax claims</u>. Each holder of a priority tax claim will be paid in full,

with interest, over a period of no later than thirty six (36) months after the petition date.

| Name and type of Administrative creditor | Estimated Amount of Claim | Treatment |
|---|---|---|
| None | None | None |

        3. <u>United States Trustee Fees</u>. Statutory fees, and any applicable interest thereon, are all fees payable pursuant to chapter 123 of title 28, United States Code, including, but not limited to, all fees required to be paid by 28 U.S.C. § 1930(a)(6) and interest, if any, required to be paid by 31 U.S.C. § 3717 (collectively, "U.S. Trustee Fees"). U.S. Trustee Fees will accrue and be timely paid until the Case is closed, dismissed, or converted to another chapter of the Bankruptcy Code. Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid in full on the Effective Date of the Plan. The Reorganized Debtors shall remain responsible for any and all U.S. Trustee fees that become due and shall pay same on a timely basis.

        4. <u>Post-Confirmation Fees and Expenses</u>. Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. The Debtors shall pay, within ten business days after submission of a detailed invoice to the Debtors, such reasonable claims for compensation or reimbursement of expenses incurred by the retained professionals of the Debtors. If the Debtors dispute the reasonableness of any such invoice, the Debtors or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice

shall not be paid until the dispute is resolved. Upon the Confirmation Date, any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## B. Treatment of Claims and Interests Under the Plan

1. Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| **Class 1** – DIP Claim of of Internex Capital Funding, LLC | Unimpaired | Paid in full pursuant to the DIP credit facility. |
| **Class 2** – Joel Schonfeld, non-priority unsecured creditor | Impaired | Each non-priority unsecured creditor will be paid pro rata from Debtors' combined Disposable Income up to the Projected Disposable Income Amount such that all of the Disposable Income of Debtors will be paid to the Class 2 and Class 3 claimants, subject to payment of Secured Claims and Administrative Priority claims, over a period not to exceed thirty six (36) months from the Effective Date of Confirmation, plus interest at the rate of 2.25%, until the Projected Disposable Income Amount is paid in full. A schedule of the filed unsecured claims and the amounts of such claims is annexed as <u>Exhibit "A"</u>.[8] |
| **Class 3** – All other Non-priority unsecured creditors | Impaired | |
| **Class 4** - Equity Holders of Debtors | Unimpaired | Retain equity interest, provided that during the Plan Term equity holders of Debtors will give up the right to receive distributions of profits in an amount totaling the Projected Disposable Income Amount. |

---

[8] Unsecured claims are currently undetermined; bar date is for both Bankruptcy Cases is November 3, 2020.

As of the Effective Date, the DIP Claim shall be an Allowed Claim in the full amount outstanding, including principal, interest, fees, and expenses, and shall be paid according to the terms of the DIP facility, indefeasibly in full in cash except to the extent that the DIP Lender agrees to a less favorable treatment.

### C. Allowance and Disallowance of Claims

1. _Disputed Claim_.  A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:

(a) a proof of claim has been filed or deemed filed, and the Debtors or another party in interest has filed an objection; or

(b) no proof of claim has been filed, and the Debtors have scheduled such claim as disputed, contingent, or unliquidated.

2. _Delay of Distribution on a Disputed Claim_.  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order. The amount of distributions for any disputed claim shall be held in reserve by the Debtor, to be distributed after the amount, if any, of such disputed claim as been finally determined. With respect to any claim that has been objected to, the Debtor shall make monthly payments to be held in escrow by counsel to the Debtor pending a final order on the claims objections. Upon entry of a final order on the claims objection, such funds shall be distributed to such creditor on account of the allowed portion of the claim.

3. _Settlement of Disputed Claims_.  The Debtors will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. All claims objections will be filed no

later than ninety (90) days after entry of the confirmation order, unless extended pursuant to order of the Court.

### D. Provisions for Executory Contracts

1. _Assumed Executory Contracts_. Except as specified herein, any executory contract or unexpired lease of the Debtors which has not been assumed or rejected by Final Order of the Bankruptcy Court, or which is not the subject of a pending motion to assume or reject on the Confirmation Date, shall be deemed assumed by the Debtors on the Effective Date.

2. _Assumed Lease for Warehouse Facility_. By this provision, the Featherstone Debtor is assuming the lease for the Featherstone Debtor's premises located at 1164 East 156th Street Bronx, NY 10474 with its landlord 1164 East 156th Realty, LLC.

3. _Rejected Consulting Agreement with J. Schonfeld_. By this provision, to the extent the consulting agreement with Joel Schonfeld is determined to have been wrongfully terminated by the Featherstone Debtor, the Featherstone Debtor rejects the Consulting Agreement. This matter is presently before the District Court for the Eastern District of New York.[9]

4. _Rejected Vehicle Lease Agreement with Milea Truck Sales and Leasing_. By this provision, the Featherstone Debtor is rejecting the lease agreement for six (6) delivery vehicles (the "Leased Vehicles") pursuant to that certain lease agreement between Milea Truck Sales And Leasing and the Featherstone Debtor dated as of November 2018 and January 2019. Debtor has surrendered five (5) Leased Vehicles to Milea Truck Sales and Leasing as of October

---

[9] On July 24, 2020 the civil action Joel Schonfeld v. Featherstone Distribution LLC was removed from Supreme Court, New York County to the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. Section 1452 and Bankruptcy Rule 9027 and assigned S.D.N.Y. Docket No. 1:20-cv-05763 (ECF Docket No. 1); the matter was further removed to the U.S. District Court for the Eastern District of New York and assigned E.D.N.Y. Docket No. 1:20-cv-3951 (LDH).

20th, 2020. The sixth vehicle will be surrendered to Milea Truck Sales and Leasing on or about November 4th, 2020.

      **E.**      **Treatment of Schonfeld Obligations under the Asset Purchase Agreement.** [10] Subject to Confirmation of Debtors' Plan and the approval of the Bankruptcy Court, Debtors agree to waive certain rights and release Schonfeld from certain obligations accruing under the Asset Purchase Agreement.

      1. Debtors shall release Schonfeld from his obligation to pay working capital adjustments under the Asset Purchase Agreement, which amount will offset the value of his Claim.[11]

      2. Debtors shall waive all rights with respect to enforcement, and the calculation of damages for breach by Schonfeld, of the Restrictive Covenants accruing up to the effective date of Confirmation.

      3. Debtors agree to reduce the duration of the Restrictive Covenants from five (5) years following the Closing Date of the Asset Purchase Agreement (as such term is defined therein) to two and one half (2.5) years, expiring on May 30, 2022 (the "Restrictive Covenant Termination Date").[12]

      The waivers and releases by Debtor of its rights under the Asset Purchase Agreement a and Schonfeld's right to receive payments under the Plan shall be conditioned on and subject to Schonfeld's continued compliance with the Restrictive Covenants through and including the

---

[10] Schonfeld has received approximately $1,000,000 in combined consideration under the Asset Purchase Agreement and his now terminated consulting agreement with the Featherstone Debtor. Schonfeld is largest unsecured creditor and will receive approximately 1/3 of Debtors' Disposable Income under the Plan.

[11] Schonfeld is obligated under the Asset Purchase Agreement to pay a working capital adjustment totaling between $150,000 and $218,000. The exact amount is in dispute.

[12] Section 6.07 of the Asset Purchase Agreement describes the "Restricted Period" as five (5) years commencing on the Closing Date. The Closing Date was November 30, 2019.

Restrictive Covenant Termination Date.

**F.     Setoffs.**   Debtors may, pursuant to § 558 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim, the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Reorganized Debtors may possess against such holder.

**G.     General**.   The payments, distributions, and other treatments provided in respect of each Allowed Claim in this <u>Article VII</u> shall be in complete satisfaction, discharge and release of such Allowed Claim, except as otherwise expressly provided.  Notwithstanding any other provision of the Plan specifying a date or time for the payment or distribution of consideration hereunder, payments and distributions in respect of any Claim and Interest which at such date or time is disputed, unliquidated, or contingent shall not be made until such Claim or Interest becomes an Allowed Claim or Allowed Interest, whereupon such payment and distributions shall be made promptly, together with any interest accrued thereon in accordance with the provisions of this Plan.

**ARTICLE VIII**
**DEBTOR'S DISPOSABLE INCOME AND PLAN FUNDING**

**A.     Priority of Claims**. Unless otherwise provided in this Plan, funds otherwise included in this Plan but not specifically disbursed directly to a Secured Creditor or for payment of an approved administrative claim under this Plan, shall be used to pay the following claims in the priority indicated:

1. Pursuant to § 1191(e) of the Bankruptcy Code, the payment of claims entitled to priority under § 507(a)(2) and § 507(a)(3) of the Bankruptcy Code shall be paid in full prior to the payment of all other claims.

2. Except as provided in § 119l(e) of the Bankruptcy Code, all claims entitled to priority under§ 507 of the Bankruptcy Code shall be paid in accordance with § 1129(a)(9) of the Bankruptcy Code.

3. All secured claims shall be paid in accordance with § 1129(b)(2)(A), § 1191(6), and § 1191(c) of the Bankruptcy Code.

4. After payment of the foregoing claims shall be paid on a pro-rata basis to allowed general unsecured claims.

5. In accordance with § 1191 of the Bankruptcy Code and the terms of this Plan, the Debtor shall retain the Debtor's interest in property of the estate.

**B.**    **Subchapter V Requirements**. Subchapter V of Chapter 11 of the Bankruptcy Code modifies the requirements for a Chapter 11 small business debtor to obtain a confirmed restructuring plan. The existing requirements for confirmation are set forth in 11 U.S.C.S. § 1129. 11 U.S.C.S. § 1191(a) requires that a debtor meet of all the existing requirements for confirmation under § 1129(a), with the exception of § 1129(a)(15) which does not apply. Under § 1191(b), a Subchapter V debtor may confirm a plan *without* acceptance by at least one accepting impaired class as otherwise required by § 1129(a)(10) so long as the plan does not *discriminate unfairly* and is *fair and equitable* to the dissenting class. With the exception of the removal of the requirement of an accepting impaired class, this is the same standard for confirmation under existing § 1129(b), but Subchapter V amends the definition of fair and equitable for classes of unsecured creditors and interests by substituting the *disposable income*

requirement in lieu of the absolute priority rule under § 1129(b)(2)(B) and (C), respectively.

      **C.**    **Liquation Analysis.**    To confirm a plan under Subchapter V, an Impaired Creditor which does not vote to accept the Plan must receive or retain under the Plan property of a value not less than the amount that such creditor would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code (the "Best Interest Test").[13] For the Court to be able to confirm this Plan, the Court must find that all Impaired Creditors who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. Debtors maintain that this requirement is met here based upon information provided in the liquidation analysis provided below. Under the liquidation analysis, the proceeds available for distribution to the Unsecured Creditors would be $353,390 in a Chapter 7 liquidation.

      By contrast, under Debtors' Plan, the Unsecured Creditors (classes 2 and 3) will receive a total of $626,130, versus $353,390 in liquidation value, taking into consideration priority administrative claims totaling $144,609. Under the Plan, each Unsecured Creditor will receive its pro-rata share of its valid claim. Creditors of the Debtors will receive 48% more through the Chapter 11 Plan than they would in a Chapter 7 liquidation; in addition, $150,000 of Disposable Income is guaranteed by Mr. Rimer to protect the Unsecured Creditors of any shortfall.

---

[13] In a Chapter 7 case, the Debtor's assets can be sold by a Chapter 7 trustee. Administrative Claims and Secured claims are paid first from sale proceeds of property. Unsecured creditor claims are paid from any remaining sale proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

## Liquidation Analysis

| | Book Value | Adjustment | Liquid. Value | Notes |
|---|---|---|---|---|
| **Hunts Point Enterprises, LLC** | | | | |
| Cash | $33,369 | | **$33,369** | |
| Equity - Freshly Baked Holdings LLC | $18,000 | | **$18,000** | |
| Equity - Featherstone Distribution | $0 | | **$0** | |
| | | | | |
| **Featherstone Distribution, LLC** | | | | |
| Cash | $27,057 | - | **$27,057** | |
| Accounts Receivable | $2,299,668 | | | *as of 10/15/20* |
| (less unrecoverable A/R) | -$800,000 | | | *bad debt written off (2020)* |
| A/R Net | $1,499,668 | -$524,884 | **$974,784** | *35% liquidation discount* |
| Schonfeld WC Receivable | $213,911 | -$213,911 | **$0** | *assumed unrecoverable* |
| Prepayments | $23,065 | -$23,065 | **$0** | *auto insurance prepayments* |
| Undeposited Funds | $87,000 | | **$87,000** | *funds in transit (cash equivalent)* |
| Inventory | $20,000 | -$15,000 | **$5,000** | *frozen items* |
| Fixed Assets | $175,950 | -$175,950 | **$0** | *pledged to DIP lender* |
| Hunts Point Enterprises | $14,888 | | **$14,888** | *internal loan from parent to subsidiary* |
| Goodwill | $1,982,914 | -$1,784,623 | **$198,291** | *10% of book value in liquidation* |
| Security Deposits | $66,449 | -$66,449 | **$0** | *vehicle leases; rent deposits* |
| **TOTAL LIQUIDATION VALUE** | | | **$1,358,390** | |

## Best Interest Analysis

| | Liquidation Value | | Three Year Projected Disposable Income |
|---|---|---|---|
| | **$1,358,390** | | **$770,739** |
| DIP Lender (Internex) | -$790,000 | | |
| Administrative Claims | -$150,000 | Professional Fees | |
| | -$15,000 | Window Costs | |
| | -$15,000 | SubV Trustee | |
| | -$35,000 | Chapter 7 Trustee | |
| **Liquidation Value for GUCs** | **$353,390** | | **Adjusted DI for GUCs** — **$626,130** |

*LV Deductions*

**D.** **Feasibility.** In order to confirm its Plan, Debtors must demonstrate that the plan is *feasible*, which means that confirmation of the Plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. A feasibility analysis should consider: (1) Whether the Debtors will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date; and (2) whether Debtors will generate sufficient cash flow to service the monthly debt

obligations of the unimpaired creditors in the case. Projections for the next three (3) years of net income are summarized below, in round numbers, with a more detailed analysis of figures and projections set forth in Exhibit "B". These projections are based on pre-COVID performance trends, full year 2019 expenses as a percentage of gross revenue, performance shown in current monthly operating reports.

**Disposable Income Projection (rounded)**

| | 2020 | 2021 | 2022 | 2023 | Totals (3yr) |
|---|---|---|---|---|---|
| Revenue (excl JSI) | $15,262,467 | $17,017,651 | $18,072,745 | $18,795,655 | $53,886,051 |
| *% growth* | | *11.5%* | *6.2%* | *4.0%* | |
| **Disposable Income** | | $68,071 | $289,164 | $413,504 | $770,739 |
| *% profit* | | 0.4% | 1.6% | 2.2% | |

| | | |
|---|---|---|
| Administrative Claims | -$29,609 | Glass Ratner |
| | -$100,000 | Attorneys Fees |
| | -$15,000 | Subchapter V Trustee |
| **Disposable Income for GUCs Over Three (3) Years** | **$626,130** | |

Debtor's projections will show a notable decrease in expenses as a percentage of sales as business returns to pre-COVID levels. Featherstone's most recent Operating Reports demonstrate its ability to reduce operating costs as a percentage of gross revenue. For example in August of 2020, Debtor generated $373,420.41 in gross revenue with a slight operating loss (before taking into account increased interest expense due to bankruptcy).[14] Operating costs will continue to decline as a percentage of gross revenue since the very same overhead and payroll will support a 20% increase in sales. Thus, while the company is not profitable at its current sales level, down 45% from the same period in 2019 due to the economic effects of the COVID-19 pandemic and governmental action restricting the hospitality industry, the company projections show a return to profitability in 2021. See Disposable Income Analysis, Exhibit "B".

---

[14] See Monthly Operating Report of Featherstone, Docket Document No. 65.

Initially, payments and distributions under the Plan will be secured by a $150,000.00 loan to Featherstone. The plan contribution loan will be deposited in escrow (the "Escrow") with Debtors' counsel Morrison Tenenbaum PLLC ("MT Law") prior to the confirmation hearing. All payments will be made from Debtor's Disposable Income; to the extent there is a shortfall, the Escrow will be released to the unsecured creditor classes to supplement the projected Plan payments.

Notwithstanding the Escrow, Debtors expect to generate Disposable Income sufficient to fund the Plan from the regular operations of the Debtors business. The projected Plan pledges Debtor's Disposable Income to the Creditors such that Debtors will generate sufficient net profits to fund payments to the impaired class of creditors.

Based on these factors, the plan is feasible and includes a padding of approximately $150,000 to account for possible fluctuation in income and expenses. Debtor's plan is structured this way to better situate the Debtors to make timely payments and to prevent the likelihood of a default.

**E.** **Supporting Financial Projections**. The table attached hereto as Exhibit "B" provides a detailed analysis of (i) Debtors' projected Disposable Income as defined by § 1191(d) of the Bankruptcy Code, (ii) Supporting assumptions under which said projections were made, (iii) Source and value of funds available for distribution under the Plan, and (iv) Payments under this Plan.

# ARTICLE IX
## SECURED CLAIMS GENERALLY

The term "secured claim" as used in this Plan shall be consistent with § 506 of the Bankruptcy Code, and shall mean an allowed claim in an amount equal to the present value of the applicable creditor's interest in the Debtor's assets, or in the amount subject to setoff, as may be established by the Claimant's Proof of Claim, the Plan, the Confirmation Order, or separate Order of the Court.

## ARTICLE X
## TRUSTEE COMPENSATION

The Trustee shall be paid for services rendered in this Chapter 11 case an Administrative Priority Claim under § 507 of the Bankruptcy Code and pursuant to Article VII of this Plan. All fees and expenses requested by the Trustee are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code.

## ARTICLE XI
## ATTORNEY COMPENSATION

The Debtor's counsel, Morrison Tenenbaum, PLLC, shall be paid for the services rendered to the Debtor herein as an Administrative Priority Claim under § 507 of the Bankruptcy Code and pursuant to Article V of this Plan. All fees and expenses requested by the Debtor's attorney are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code. For purposes of this Plan, MTLaw has agreed to accept a flat fee of $100,000 payable as follows: $25,000 upon Confirmation, and the remainder within 12 months following Plan confirmation, subject to approval of the Bankruptcy Court.

## ARTICLE XII
## PROPERTY VESTS IN DEBTOR FREE AND CLEAR

Except as provided in this Plan or the Order confirming this Plan, all property of the estate of Debtors, pursuant to §§ 1141(b) and 1141(c) of the Bankruptcy Code, vests in the

respective Debtors as of the Effective Date, free and clear of any claim or interest of any creditor provided for by this Plan.

## ARTICLE XIII
## CONFIRMED PLAN BINDING ON DEBTOR AND CREDITORS

Except as provided in §§ 1141 or 1192 of the Bankruptcy Code, as applicable, the provisions of this Plan shall, upon confirmation, bind the Debtor, each and every creditor of this estate and each party in interest, whether or not the claim of such creditor or party is provided for by the Plan and whether or not such creditor or party has accepted or has rejected the Plan.

## ARTICLE XIV
## DISCHARGE

Upon the payment by the Debtor of the sums required under this Plan and application to the Court, the Debtor shall be eligible to receive a discharge under § 1192 of the Bankruptcy Code. If the Debtors' Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtors will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)1)(A) of the Bankruptcy Code, except that Debtors will not be discharged of any debt (A) imposed by this Plan; or (B) to the extent provided in § 1141(d)(6).

If the Debtors' plan is confirmed under § 1191(b), confirmation of this plan does not discharge any debt provided for in this Plan until the Court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The debtor will not be discharged from any debt: (X) on which the last payment is due after the first three (3) years of the Plan, or as otherwise provided in § 1192; or (Y) excepted from discharge under § 523(a) of the Bankruptcy Code,

except as provided in rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## ARTICLE XV
## EXIT FINANCING

To the extent necessary to pay the Debtors' obligation under Article VIII of this Plan or Class 2 or Class 3 Creditors, Debtors' principal, Mr. Rimer, will loan the reorganized Debtors funds necessary to pay up to $150,000 of Unsecured Claims. Debtors shall be permitted to repay the exit financing from available cash that is not part of Disposable Income.

## ARTICLE XVI
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.      Modification and Amendments Subject to the limitations contained in the Plan.** The Debtors, with the consent of the DIP Lender, reserves the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate. The Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, with the consent of the DIP Lenders one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**B.      Effect of Confirmation on Modifications.**   Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.      Revocation or Withdrawal of the Plan.**   Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all

28

respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims; (ii) prejudice in any manner the rights of the Debtors, including the holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors.

## ARTICLE XVII
## MISCELLANEOUS

**A.**     **Definitions and Rules of Construction.** Unless otherwise defined herein, the definitions and rules of construction set forth in § 101 and § 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan,

**B.**     **Effective Date of Plan.** The effective date of this Plan is the first business day following the date that is fourteen days after the entry of the Order of confirmation. If, however, a stay of the confirmation Order is in effect on that date, the effective date will be the first business day after the date on which the stay of the confirmation Order expires or is otherwise terminated.

**C.**     **Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**D.**     **Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

E.     **Appendices.** The Appendices attached to the Plan are incorporated into the Plan by reference as if the same were fully rewritten herein.

F.     **Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

G.     **Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the Commonwealth of Pennsylvania govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

## ARTICLE XVIII
## PLAN PROPOSED IN GOOD FAITH

The Debtors represent that it is within Debtors' ability to carry out this Plan, and the Plan is submitted in good faith.

## ARTICLE XIX
## RETENTION OF JURISDICTION

The Court shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy

Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

Dated: New York, New York
      October 19, 2020

                    MORRISON TENENBAUM PLLC

                    By:/s/ Lawrence Morrison
                    Lawrence F. Morrison
                    87 Walker Street, Floor 2
                    New York, New York 10013
                    Tel.: (212) 620-0938
                    *Counsel for the Debtors*
                    lmorrison@m-t-law.com